## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                         No. CR 14-2114 RB

RUBEN CANTU,

      Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** is before the Court on Defendant's Motion to Suppress.  (Doc. 51.) The Indictment charges Defendant with: Count 1, on or about March 5, 2014, being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and Count 2, on or about March 5, 2014, being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (Doc. 3.)

The firearms and ammunition were discovered in Defendant's residence during the execution of a state search warrant.  The search warrant was obtained based on video from a camera installed on a utility pole about 70 yards from residential property in Hobbs, New Mexico.  Defendant's brother, Rolando Cantu, resided at the property and was under investigation for drug trafficking.  On March 5, 2014, a law enforcement officer monitoring the video feed observed Defendant carrying an assault rifle as he walked in the common area between the two residences.  Officers found that Defendant had a prior felony conviction.  Based

on this information, officers obtained a search warrant for the residence at 107 East Gypsy in Hobbs.  Officers found the firearm and ammunition in the bathroom and more ammunition in the kitchen.

Defendant contends that the use of a video camera located on a utility pole approximately 70 yards from his residence constituted an unreasonable search in violation of the Fourth Amendment.  (Doc. 51.)  Defendant asserts that (1) he had an expectation of privacy in his property and person; and (2) the officers should have obtained a warrant to install the camera. (*Id.*)

The Court held a suppression hearing on November 10, 2015, received the parties' Joint Stipulation of Facts, and heard the arguments of counsel.  Having carefully considered the submissions and arguments of counsel, and being otherwise fully advised, the Court **DENIES** Defendant's motion.

## FINDINGS OF FACT[1]

1. On or about February 5, 2014, a video camera was installed on a utility pole approximately 70 yards from the residential property at 107 and 109 East Gypsy in Hobbs, New Mexico ("Gypsy property").

2. An employee of the local utility company, Xcel Energy, installed the video camera at the request of the Lea County Drug Task Force ("LCDTF").

3. The video camera belonged to the Hobbs Police Department, and the LCDTF made the request to install the camera on the utility pole because the LCDTF and the Federal Bureau of Investigation ("FBI") were investigating a drug trafficking organization operating in Hobbs, New Mexico.

---

[1] The Findings of Fact consist of the parties' Joint Stipulation of Facts.

4.      One of the individuals under investigation was Rolando Cantu, who resided at the Gypsy property.  Rolando Cantu is Defendant's brother.

5.      On October 18, 2013, and October 23, 2013, under the direction of law enforcement, a confidential informant had purchased methamphetamine from Rolando Cantu at his residence at the Gypsy property.

6.      On January 30, 2014, a week before the video camera was installed, the FBI obtained a court-authorized wiretap order for interception of Rolando Cantu's cellular telephone.

7.      LCDTF selected this particular utility pole for placement of the video camera because it was the closest utility pole to the Gypsy property that had a power source for the camera.

8.      Only utility poles with either a transformer or a light could be used as a power source for the video camera, and this utility pole was the closest such pole to the Gypsy property.

9.      The utility pole upon which the video camera was placed was on the side of a paved alley which provided access to the parking lot and commercial buildings on either side of the roadway.

10.     The public had access to this alley and the pole.

11.     From the vantage point of the video camera, agents could only observe the front of the Gypsy property.

12.     Specifically, agents could view a common, unpaved area between Rolando Cantu's house on the east side (left side if one was facing the property from the street) and Defendant's trailer on the west side of the property.

13.     The video camera did not record sound, and the agents could not view the inside of either residence on the Gypsy property with the video camera.

3

14.     There was no fence or other barrier blocking access or obscuring the view of the front of the Gypsy property.

15.     The video camera provided a continuous live feed, with an approximately 5 or 6 second delay, to a television screen at the LCDTF office in Hobbs, New Mexico.

16.     The video camera transmitted the live feed over the cellular network.

17.     Agents at the LCDTF office could adjust the camera and zoom in or out, take still photographs of the video feed, and record the video feed to a hard drive at the LCDTF office.

18.     Agents at the LCDTF office monitored the video feed from approximately 8:00 a.m. to 10:00 p.m. each day the office was staffed.

19.     At times during the investigation, agents were on surveillance or conducting operations and no one was available at the office to monitor the video camera feed.

20.     The video camera itself was equipped with a terabyte of memory, and after the camera memory was full, the video camera would write over the previous recordings.

21.     LCDTF agents had the video camera removed from the Gypsy property and placed at another property in Hobbs sometime after Defendant's brother, Rolando Cantu, was arrested on March 8, 2014, on a state probation violation.

22.     Although LCDTF agents did not record the exact date of the move, the video camera was in use at another address on Chama Street in Hobbs, New Mexico on March 28, 2014.

23.     On March 5, 2014, at approximately 3:42 p.m., LCDTF Commander Mike Wilson saw a Hispanic male on the live video feed from the Gypsy property carrying what appeared to be an assault rifle as he walked in the common area between the two residences.

24.     This portion of the live video feed was recorded, and Commander Wilson captured several still photographs from the video feed of the individual walking with the assault rifle.

25.     LCDTF agents previously had received information from New Mexico Probation and Parole that Ruben Cantu lived in the trailer at 107 E. Gypsy.

26.     Based on this information and the comparison of a photograph of Ruben Cantu from the Hobbs Police Department database with the still photographs from the video camera, agents identified the individual carrying the assault rifle as Defendant, Ruben Cantu.

27.     LCDTF agents obtained Defendant's criminal history and learned that Defendant had a prior felony conviction and could not lawfully possess a firearm under New Mexico state law.

28.     LCDTF agents then obtained a state district court search warrant for the property at 107 E. Gypsy authorizing agents to search for, and seize, any firearms and ammunition found in the residence.

29.     At approximately 8:02 p.m. on March 5, 2014, agents executed the search warrant at 107 E. Gypsy.

30.     After knocking and announcing, "police, search warrant," multiple times, agents could hear someone running through the trailer.

31.     LCDTF Agent Keith Clayton then pushed on the front door, which was partially opened, and entered the residence.

32.     In the hallway of the trailer, Agent Clayton saw a clear plastic bag with a white crystal-like substance that appeared, based on his training and experience, to be methamphetamine.

33.     Agent Clayton then entered the south bedroom of the trailer and saw a hole in the floor.

34.     When Agent Clayton looked in the hole, he saw Defendant attempting to crawl away.

35.     Agents surrounded the trailer and removed the flashing surrounding the bottom of the trailer.

36.     After removing the flashing, agents found Defendant underneath the trailer.

37.     Agent Clayton then obtained an amended state district court search warrant that authorized the seizure of not only firearms and ammunition but also drugs and drug paraphernalia based on the suspected methamphetamine Agent Clayton saw in the trailer.

38.     When agents executed the amended search warrant, they found a Bushmaster AR-15 .223 caliber rifle, serial number CBC075915, and approximately 27 rounds of Lake City, .223 caliber ammunition in the bathroom of the trailer.

39.     Agents also found 88 rounds of Lake City, .223 caliber ammunition in the oven in the kitchen.

40.     The white crystalline substance found in the trailer subsequently tested negative for the presence of methamphetamine.

41.     The parties stipulate that Defendant's exhibits A through D and Government's exhibits 1 through 6, which were attached respectively to Defendant's Motion to Suppress and to the Government's Response, should be admitted as evidence.

### CONCLUSIONS OF LAW

1.     The Fourth Amendment protects only reasonable expectations of privacy.  *See Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring).  A Fourth Amendment

search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information. *See United States v. Jones*, 132 S.Ct. 945, 947 (2012).

2.      Whether a defendant's Fourth Amendment rights were violated by a challenged search turns on: (1) whether the defendant manifested a subjective expectation of privacy in the area searched and (2) whether society is prepared to recognize that expectation as objectively reasonable. *United States v. Barrows*, 481 F.3d 1246, 1248 (10th Cir. 2007).

3.      "The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 211 (1986). Law enforcement agents may use their resources to conduct surveillance where they have a legal right to occupy. *See, e.g., Florida v. Riley*, 488 U.S. 445, 449 (1989) (stating that "the police may see what may be seen from a public vantage point where they have a right to be"). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351 (citation omitted).

4.      While not directly on point, *Jones* is instructive. Therein, the Supreme Court examined whether affixing a Global Positioning System (GPS) tracking device to a vehicle and monitoring the vehicle's movements on public roadways constituted a search under the Fourth Amendment. *Jones*, 132 S.Ct. at 950.

5.      Justice Scalia, writing for the majority, determined that the development in *Katz* of the "reasonable expectation of privacy" standard did not repudiate earlier Fourth Amendment jurisprudence preventing the government's warrantless trespass upon individuals, homes, papers, and effects. *Jones*, at 950–51. Because the defendant's vehicle was an "effect," the placement

of a GPS tracking device on its undercarriage for the purpose of gathering information was a search under the Fourth Amendment.  *Id.* at 951.

6.      In so holding, Justice Scalia wrote that "[t]his Court has to date not deviated from the understanding that mere visual observation does not constitute a search."  *Jones*,  at 953. Additionally, whether a particular government action constitutes a search has traditionally not turned upon whether the action occurred over a certain time period or related to the investigation of a certain type of crime.  *Id.* at 954.

7.      In a case on point, the Tenth Circuit Court of Appeals held that the "use of video equipment and cameras to record activity visible to the naked eye does not ordinarily violate the Fourth Amendment."  *United States v. Jackson*, 213 F.3d 1269, 1280 (10th Cir.), *vacated on other ground*, 531 U.S. 1033 (2000).  In *Jackson*, the Tenth Circuit analyzed the warrantless use of two video cameras installed on telephone poles, which law enforcement used to observe two residences.  *Id.*  The cameras had a zoom function and could be remotely adjusted but could not be used to see into the houses and did not record sound.  *Id.* at 1276.  Observing that the protection under the Fourth Amendment does not extend to activity that one knowingly exposes to the public, the Court of Appeals reasoned that the cameras at issue could not be used to see inside the houses and could only see what any passerby could see.  *Id.* at 1281.  Accordingly, the Tenth Circuit determined that the defendants had no reasonable expectation of privacy in what the cameras recorded.  *Id.*

9.      While *Jackson* predates *Jones*, other courts have reached similar conclusions post-*Jones*.  *See United States v. Nowka*, 2012 WL 6610879, *5 (N.D. Ala. Dec. 17, 2012) (holding that eight-month warrantless surveillance of the defendant's yard and driveway from camera mounted on utility pole was not a search under Fourth Amendment because the

defendant had no reasonable expectation of privacy in view, "which any person could see from the public street"); *United States v. Brooks*, 2012 WL 5984804, *7 (D. Ariz. Nov. 28, 2012) (holding that five-month warrantless video surveillance of apartment complex parking lot and stairwells with pole camera did not violate Fourth Amendment because defendant had no reasonable expectation of privacy in area open to public view). Thus, the holding in *Jackson* applies herein.

10. Defendant argues that the fact the pole was placed approximately 70 yards away from his residence rather than directly overlooking his property distinguishes the case at hand from *Jackson*. (Doc. 51 at 4–5.) The logic of this argument is unclear as the cameras in *Jackson* overlooked the property in that case albeit from a lesser distance. *Jackson*, 213 F.3d at 1276. The rationale of *Jackson* and similar cases was that no reasonable expectation of privacy exists in areas that are exposed to public view. The fact that the camera in this case was placed on a utility pole approximately 70 yards away is not relevant to the analysis. What is relevant is that the view of the front area of the residence consists of an unobstructed dirt parking lot. There was no attempt to enclose the area or otherwise shield it from public view. The area was open and viewable by any passerby on the street. Under these circumstances, Defendant did not have a reasonable expectation of privacy in the area in question.

11. Additionally, Defendant argued that the law should change to keep pace with new technology such as aerial drones. The Court notes that this argument is not germane because a drone was not utilized in this case. Moreover, while the topic of aerial drones may be in vogue, the law on aerial surveillance has been well-established for decades. In *California v. Ciraolo*, 476 U.S. 207 (1986), the defendant's backyard was shielded from view at ground level by two fences. Police officers secured a private plane, flew over the defendant's house and identified

marijuana plants growing in the yard.  The Supreme Court held that the aerial inspection did not amount to a search protected by the Fourth Amendment, stressing the fact that the observation was within navigable airspace and that the observation was physically non-intrusive.  *Id.* at 213.

12.     In *Florida v. Riley*, 488 U.S. 445 (1989), the Supreme Court stated that police observation of a greenhouse in a home's curtilage from a helicopter passing at an altitude of 400 feet did not violate the Fourth Amendment.  The Court stated that "the home and its curtilage are not necessarily protected from inspection that involved no physical invasion" and that, "[a]s a general proposition, the police may see what may be seen 'from a public vantage point where [they have] a right to be.' "  *Riley*, 488 U.S. at 449.  Accordingly, the defendants' expectation of privacy was "not reasonable and not one 'that society is prepared to honor.' "  *Id.*

13.     The video surveillance of unobstructed area in this case, which did not involve a physical trespass and did not permit law enforcement to see or discern what was happening within the residence, was not a search under the Fourth Amendment.  Defendant's arguments to the contrary are unpersuasive.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress (Doc. 51) is **DENIED**.

_____

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**